**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| GREGG ARENSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 20-cv-02800 |
| | ) | |
| FIRST UNUM LIFE INSURANCE COMPANY, | ) | Judge John J. Tharp, Jr. |
| | ) | |
| Defendant. | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Gregg Arenson, a former futures and options trade broker, sues his former employer's benefits administrator, First Unum Life Insurance Company ("Unum") under the Employee Retirement Income Security Act ("ERISA"). He challenges Unum's denial of his claims for long-term disability and waiver of life insurance premiums, arguing that Unum discounted the effect of his cognitive disabilities after he suffered a stroke at work. Unum's long-term disability plan affords it discretion in benefits determinations, and the Court may not overturn those determinations unless Unum's decision was so unreasonable as to be arbitrary and capricious. Arenson's medical records revealed no severe cognitive difficulties, and Unum's qualified physicians explained why, in their opinions, isolated mild cognitive inefficiencies did not preclude Arenson from returning to work. The Court cannot find, based on that evidence, that Unum's decision was irrational. Although Arenson's life insurance plan does not afford Unum the same deferential treatment, Arenson has not shown that he is entitled to coverage under that plan. Accordingly, Arenson's motion for partial summary judgment is denied, and Unum's motion for summary judgment is granted.

## BACKGROUND

### I.     Arenson's Work Background and Stroke

Arenson was a Financial Futures and Options Execution Broker in the Chicago office of BGC Financial, where he worked since 2012. His job involved brokering trade orders on the Chicago Mercantile Exchange and supervising other employees as branch office manager. Arenson suffered a stroke while at work on October 11, 2018. After experiencing some right arm numbness, Arenson drove to Glenbrook Hospital. There, an MRI revealed that he had one "small, acute cortical infarct in the left precentral gyrus" and a "small chronic lacunar infarct in the right cerebellar hemisphere." LTD 172.[1]

A vascular neurologist, Dr. Archie Lim Ong, evaluated Arenson the next day. Interpreting Arenson's MRI, Ong noted the "acute" stroke in the left frontal cortex, *i.e.*, the stroke that Arenson experienced at work, and the "[p]ossible old right cerebellar small infarct." LTD 365-66. Ong performed a neurological exam and noted that Arenson was "alert" and "oriented." LTD 365. On the National Institute of Health ("NIH") Stroke Scale, Ong rated Arenson a "0," reflecting no abnormalities. After two days of hospitalization, Arenson was discharged.

About ten days later, Arenson followed up with Ong. Ong again performed neurological tests, rated Arenson a "0" on the NIH stroke scale, and noted that Arenson's mental status was normal. Although Arenson reported no new stroke symptoms to Ong, Arenson described some persistent transient numbness in his right hand. Ong also noted that "[e]ven prior to the stroke,

---

[1] Citations beginning with "LTD" refer to the last digits of the Bates number beginning "FU-CL-LTDNL15547469-00" in the Administrative Record for Arenson's Long Term Disability claim. ECF Nos. 21-1, 21-2. Citations beginning with to "LWOP POL" refer to the last digits of the Bates number beginning "FU-LWOP-POL-423261001-00" in the Life Insurance Plan. ECF No. 21-4.

[Arenson] believes his vocabulary has worsened. He cannot remember certain words that he used to use during conversations." LTD 452. Later in his notes, Ong indicated that these reported vocabulary difficulties were "unlikely to be from [mild cognitive impairment] since [short test of mental status] is normal." LTD 461. Ong wrote that he would "just check for common reversible causes" and gave Arenson the "option to do neuro psych testing to get a baseline." *Id.*

Around the same time, Arenson was diagnosed with non-obstructive coronary artery disease. In November 2018, Arenson's cardiologist found that Arenson had risk factors for atrial fibrillation, a heart condition that could cause strokes, and referred him for a loop recorder placement, a heart monitoring device which would detect such abnormalities. At an appointment later that month, Arenson's primary care physician, Dr. Richard Hayes, instructed Arenson to remain off work "[d]ue to high stress of his current employment and the increase of his blood pressure related to his work responsibilities." LTD 159. Hayes indicated Arenson should be "[o]ff work until all records reviewed." *Id.* Arenson had the loop recorder installed in December 2018, which ultimately displayed normal results.

## II. Arenson's Initial Benefits Application and Relevant Plan Provisions

Arenson applied for and received short-term disability benefits from Unum, the administrator of the benefits plans sponsored by his employer. Arenson exhausted short-term disability benefits in January 2019. On December 18, 2018, Unum opened an inquiry into whether Arenson qualified for long-term disability benefits and for a waiver of the premiums for payments under his life insurance policy.

Pursuant to the Long Term Disability Plan, an employee may receive long-term disability benefits in the form of a partial income payment if the employee is disabled. An individual is considered "disabled" under the Long Term Disability Plan if the individual is "limited from performing the material and substantial duties of [the individual's] regular occupation due to . . .

sickness or injury" and has a resulting loss in income of 20 percent or more. LTD 69. A "regular occupation" is one that the employee "is routinely performing when [the] disability begins." LTD 88. To determine an employee's regular occupation, Unum examines the occupation "as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location." *Id.* The Long Term Disability Plan has a ninety-day elimination period, which means "a period of continuous disability which must be satisfied" before an employee may receive benefits. LTD 86. The plan also grants Unum "discretionary authority to make benefit determinations," which includes "determining eligibility for benefits . . . and interpreting and enforcing the provisions of the Plan." LTD 95.

Unum's Life Insurance Plan works a little differently. Under that plan, an employee is eligible to have life insurance premium payments waived after a nine-month elimination period during which the employee is not working due to injury or illness. After that nine-month elimination period, during which the employee is required to pay premiums, the employee is considered disabled if "unable to perform the duties of any gainful occupation for which [the employee] is reasonably fitted by training, education, or experience." LWOP POL 18, 38. Unlike the Long Term Disability Plan's "regular occupation" provision, "gainful occupation" under the Life Insurance Plan is not limited to an employee's prior job responsibilities. And unlike the Long Term Disability Plan, the Life Insurance Plan does not afford Unum discretion in making benefits determinations.

To determine whether Arenson satisfied the definition of disabled under either plan provision, Unum received information about Arenson's responsibilities from BGC. Unum representatives also called Arenson to discuss his responsibilities, restrictions and limitations. Based on this conversation and on employment records, an expert at Unum prepared a vocational

analysis report. Among other things, that report listed "making judgments and decisions in work situations that involve solving problems, making evaluations, and/or reaching conclusions based on multiple criteria and data sustained focus and concentrations" as part of Arenson's job requirements. LTD 326.

In early 2019, Unum sent letters to Ong, asking whether Arenson could perform the listed job requirements in the vocational analysis. Ong replied that Arenson could perform those occupational demands and return to work in February 2019. Unum then obtained reviews of Arenson's medical records from two in-house internal medicine physicians, Dr. Renee Chervenak and Dr. Sharon Hogan. Both doctors concluded that Arenson could perform the material duties of his former job, citing the lack of "focal, neurological, cognitive or functional deficits" reflected in the records. LTD 609, 615. In support of their findings, the doctors both noted that Hayes, Arenson's primary care physician found that his neurological exam was "physiological," or normal, during multiple visits. LTD 608, 615. In April 2019, Marmor, Arenson's cardiologist, sent Unum a letter reflecting his concerns that Arenson's anxiety could cause his blood pressure to spike and recommending that plaintiff undergo psychiatric treatment before returning to work. Marmor's letter did not change Chervenak's and Hogan's opinions.

Relying on Chervenak and Hogan's findings, Unum denied Arenson's Long Term Disability claim in a letter dated May 15, 2019. Unum indicated that its decision might not affect Arenson's life insurance premium waiver claim.

### III.    Arenson's Administrative Appeal and Present Lawsuit

In November 2019, Arenson appealed Unum's decision. In support of his appeal, Arenson submitted the results of tests performed by Steven Rothke, a board-certified clinical neuropsychologist, in August 2019. Rothke interviewed Arenson, spoke with Arenson's former colleagues, and performed dozens of tests intended to measure Arenson's cognitive abilities.

5

Rothke concluded that Arenson displayed "a few isolated cognitive impairments/inefficiencies . . . (although this still may represent a decline from his pre-stroke level of functioning)." LTD 813. Arenson exhibited average or above average levels of functioning in almost all areas of testing. Some tests revealed, however, limitations in learning new information, especially in a short period of time, as well as low visual memory, which would limit Arenson's ability to problem solve as well as he did in the past. Along with Rothke's report, Arenson submitted a vocational report prepared by Craig Johnston. Johnston determined that Arenson's job responsibilities, which required managerial skills and quick thinking, encompassed more than those of a broker or securities trader. Both Johnston and Rothke, in a supplemental report, concluded that Arenson would not be able to manage his so-called "broker-plus" responsibilities in light of his cognitive difficulties.

To review Arenson's appeal submissions, Unum enlisted on-site expert physicians, neurologist Jacqueline Crawford and psychiatrist Peter Brown. After examining Rothke's report and Arenson's other medical records, Crawford determined that Arenson's medical records did not support Arenson's claim that a stroke caused his cognitive deficiencies. Crawford noted that Arenson's providers at the hospital documented Arenson's normal mental status even immediately after the stroke, when symptoms are supposed to be at their worst and referenced Ong's normal test results. Crawford further determined that the isolated impairments revealed by Rothke's neuropsychological testing "did not correlate to the left pre-central gyrus or right cerebellum." LTD 968. Brown concurred in Crawford's assessment. Unum also obtained an additional report from vocational expert Kelly Marsiano, who agreed with Johnston that Arenson's job responsibilities encompassed more than just the responsibilities of a securities

trader. Instead, according to Marsiano, Arenson's job responsibilities involved a combination of those of a securities trader and brokerage office manager.

Unum shared its expert reports with Arenson, who shared them with Rothke. Rothke submitted a report in which he responded to the physicians' critiques of his testing, pointing out that multiple injuries to the brain, including those that Arenson suffered, could affect attention, concentration, memory, and executive functioning.

In January 2020, Arenson submitted Rothke's response to Unum, along with an objection that Crawford and Brown lacked the qualifications to evaluate Arenson's neuropsychological test results. Unum asked Brown whether a neuropsychologist should review Rothke's test results, and Brown suggested a referral as well as a re-analysis of the raw test data underlying the results. Following Brown's instructions, Unum asked neuropsychologist David Nowell about the "level of cognitive function . . . demonstrated in the neuropsychological testing" and the "psychological factors recognized in the neuropsychological testing." LTD 1064. Nowell did not appear to request any raw data but concluded in a report that Arenson scores were "not consistent with severe cognitive impairment." *Id.* In support, Nowell explained that Arenson scored below average on only five out of fifty-three cognitive tests that Rothke administered and that none of those scores fell within the impaired range. After reviewing Nowell's report, Crawford and Brown submitted their own reports, explaining why Nowell's report did not change their minds about Arenson's ability to return to work.

Arenson responded to Nowell's report in a letter dated February 26, 2020, noting his disagreement with Nowell's evaluation. In a twelve-page letter explaining its reasoning and addressing Arenson's concerns, Unum affirmed its denial of Long Term Disability benefits on February 28, 2020. Unum relayed that "[a] determination was not issued on a Life Insurance

Premium Waiver claim because Mr. Arenson was not found to be disabled through the elimination period." LTD 1100.

In May 2020, Arenson brought an ERISA lawsuit against Unum in this Court. That statute confers this Court with jurisdiction over actions brought to recover benefits under employee benefit plans. 29 U.S.C. § 1132(e)(1). Having waived discovery, Arenson moves for partial summary judgment on the administrative record, seeking a reversal of Unum's denial of his long-term disability claim and a declaration that he exhausted his administrative remedies with respect to his premium waiver claim. Unum, in turn, moves for summary judgment on both claims.

## DISCUSSION

### I. LTD DECISION

Neither party disputes that Unum's Long Term Disability Plan grants the administrator discretionary authority to make benefit determinations. Pursuant to that discretion, the Court affords Unum a high level of deference; the Court may not overturn Unum's benefit determination unless it is arbitrary and capricious. *See Black v. Long Term Disability Ins.*, 582 F.3d 738, 745 (7th Cir. 2009). If a possible reasonable explanation, based on the record evidence, supports Unum's denial, then its decision is not arbitrary or capricious. *See Geiger v. Aetna Life Ins. Co.*, 845 F.3d 357, 362 (7th Cir. 2017). The burden lies with Arenson to show that Unum's decision to deny him benefits had no "rational support in the record." *Frye v. Thompson Steel Co.*, 657 F.3d 488, 495 (7th Cir. 2011) (quoting *Sellers v. Zurich Am. Ins. Co.*, 627 F.3d 627, 632 (7th Cir. 2010)). Although arbitrary and capricious review does not mean that the Court may rubber stamp a plan administrator's irrational decision, the Court must uphold the denial of benefits if the administrator reasonably supports its claim denial. *Black*, 582 F.3d at 745. "Questions of judgment are left to the plan administrator, and it is not [the Court's] function to

decide whether [it] would reach the same conclusion as the administrator.*" Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 576 (7th Cir. 2006) (cleaned up).

### A.      Reasonableness of Unum's Claim determination

Under Unum's Long Term Disability Plan, a claimant who is "limited from performing the material and substantial duties of [the claimant's] regular occupation due to . . . sickness or injury" is disabled. LTD 69. Arenson claims he fits that definition because his strokes caused a mild neurocognitive disorder that renders him unable to complete problem solving tasks inherent to his former position. Unum denied his claim, concluding that medical records reflected a recovery from his stroke and that "subsequent testing did not reflect cognitive or psychiatric impairment." LTD 1110.

The Court finds that Unum reasonably relied on the opinions of multiple physicians to reach that decision. Dr. Ong, the physician who first treated Arenson's second stroke, did not find that Arenson suffered from any cognitive impairments. Quite the opposite; Arenson scored a "0" on the NIH Stroke Scale and his short test of mental status was normal. Although Ong gave Arenson the "option to do neuro psych testing" to evaluate Arenson's perceived vocabulary difficulties, Ong determined that those difficulties were "unlikely to be from [mild cognitive impairment]" because testing revealed normal results. LTD 461. When Unum asked Ong whether Arenson could perform the material duties of his job, Ong determined that Arenson was able to "make[] judgments and decisions in work situations that involve solving problems, making evaluations, and/or reaching conclusions based on multiple criteria and data." LTD 508. That Ong, the treating physician with the most exposure to Arenson after his stroke, determined that he was not cognitively impaired supports Unum's initial benefit denial.

In fact, all of the physicians to treat Arenson and to review his records at the initial claim determination stage concluded that Arenson's strokes did not cause any cognitive impairments.

Two of Unum's internal medicine specialists, Chervenak and Hogan, observed that none of Arenson's treating physicians determined that he had cognitive deficits after conducting clinical exams and that his neurological exams appeared normal. Arenson's treating physicians, Hayes and Marmor, did harbor some concerns about Arenson's returning to work. But those concerns centered the stressful nature of Arenson's job, his high blood pressure, and his anxiety, which are not relevant to Arenson's sole claim on administrative appeal and before this Court: that Unum ignored the effect of his cognitive deficits. None of Arenson's examining physicians found that he had a cognitive impairment, a fact that Unum's reviewing physicians relayed to Unum. Relying upon those opinions was certainly reasonable.

On appeal of Unum's initial determination, two more of Unum's experts, Crawford and Brown, evaluated neuropsychological tests that Arenson submitted, acknowledged that those tests revealed mild inefficiencies, and concluded that those inefficiencies were not relevant to Arenson's ability to work. In support, these doctors relied on their own expertise (Crawford was a neurologist and Brown a psychiatrist) and referenced Arenson's medical records, which included Arenson's hospital treatment records, Ong's treatment notes, and the test results of Arenson's neuropsychologist. In response to Arenson's claim that Drs. Brown and Crawford were not qualified to interpret the test results reported by Dr. Rothke, a neuropsychologist, Unum hired its own neuropsychologist, Dr. David Nowell, who interpreted that data, and shared it with Crawford and Brown. Crawford and Brown looked at that data and explained why it did not change their opinion. Because Unum's doctors reasonably explained their decisions, and those opinions are "rationally supported by record evidence," the Court must defer to Unum's choice to credit those opinions over those of Arenson's doctors. *Black*, 582 F.3d at 745-46.

10

### B.    Qualifications of Unum's Physicians

Resisting this Court's deferential standard of review, Arenson attacks Unum's decision as procedurally unreasonable. Arenson first argues that Crawford and Brown were not qualified to evaluate the neuropsychological testing that Arenson submitted in support of his appeal. ERISA regulations mandate that a reviewing health care professional have "appropriate training and experience in the field of medicine involved in the medical judgment." 29 C.F.R. § 2560.503-1(h)(3)(iii). It remains unclear, however, why a neurologist and psychiatrist—both medical specialists who treat maladies linked to the brain—were unqualified to opine on medical records describing Arenson's cognitive functioning after a stroke. This is not a case in which "[t]here is nothing in the record to indicate" that Unum's doctors have pertinent expertise. *Compare Crespo v. Unum Life Ins. Co. of Am.*, 294 F. Supp. 2d 980, 995 (N.D. Ill. 2003). Unum was entitled to rely on in-house doctors who specialize in treating the area that Arenson claimed was impaired.

To support his assertion that only a neuropsychologist may evaluate neuropsychological tests, Arenson cites a sports-medicine journal article that was not included in the administrative record. Even if this sports-medicine article presented data relevant to Arenson's occupational-benefits claim, where abuse of discretion is the standard of review, "judicial review is limited to the evidence that was submitted in support of the application for benefits." *Perlman v. Swiss Bank Corp. Comprehensive Disability Prot. Plan*, 195 F.3d 975, 982 (7th Cir. 1999). Under a deferential standard of review, the Court cannot consider evidence that was not before the plan administrator.

Unable to support Crawford and Brown's lack of qualifications with record evidence, Arenson argues that Crawford and Brown admitted their lack of experience by consulting the opinions of other physicians. Crawford and Brown's reports, however, do not betray a lack of qualifications and training. In deferring to Brown to discuss Arenson's neuropsychological test

results more thoroughly, Crawford never stated that she was unqualified to evaluate every aspect of those tests. Rather, Crawford provided her own opinion and delegated Brown to discuss "behavioral health concerns" that those tests revealed. LTD 968. In other words, Crawford's referral to Brown sought to evaluate the neuropsychologist's test through the lens of Brown's specialty, psychiatry. That does not mean Crawford's neurological perspective was infirm. Similarly, Brown's request for an additional neuropsychological evaluation does not establish that Brown lacked appropriate qualifications; it is equally consistent to infer that Brown requested a second opinion—at Arenson's urging—to bolster his own conclusions about the data. Such a belt-and-suspenders approach does not exhibit a lack of qualifications; if anything, it provides additional support for the view that the administrator conducted a thorough and comprehensive review of Arenson's claim.

The rest of Arenson's protests about Crawford and Brown's qualifications amount to disagreements with their medical judgments, disputes that this Court may not resolve. *See Black*, 582 F.3d at 745-46. To counter Crawford's conclusion about the lack of correlations between Arenson's strokes and his cognitive symptoms, Arenson again cites a source outside the record. The Court reiterates that it cannot evaluate medical evidence that was never presented to the administrator or its specialists. *Perlman*, 195 F.3d at 382.

Arenson also faults Crawford for "fail[ing] to appreciate the possibility"—raised by Arenson's reviewing neuropsychologist, Dr. Rothke—that two strokes, particularly including one in the cerebellum, could have caused cognitive impairments in tandem. Pl.'s Mem. in Supp. S. J. at 8, ECF No. 24. Crawford did recognize that possibility; she just rejected it. She noted that Arenson had previously functioned at work despite having suffered the cerebellum stroke, so any effect of that stroke could not have been "functionally relevant" to Arenson's work duties. LTD

1059. Whether that explanation was medically correct is beyond the scope of the Court's review; the Court cannot choose between conflicting expert opinions to evaluate the evidence. *Semien v. Life Ins. Co. of N. Am.*, 436 F.3d 805, 812 (7th Cir. 2006).

Arenson characterizes Crawford's dismissal of the effects of Arenson's first stroke as irrational, pointing out that a person may struggle through a disability while working full time before filing a claim. *See Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 918 (7th Cir. 2003). That may be true, but the record does not support Arenson's claim that he experienced cognitive impairments at work prior to his second stroke. *See Perlman*, 195 F.3d at 982-83 (deeming rational Unum's consideration of claimant's ability to work after her injury when nothing in the record indicated that her condition worsened before she filed her claim). To the contrary, Arenson's own treating physician, Dr. Ong, dismissed the idea that Arenson's reported pre-stroke vocabulary difficulties were due to any cognitive deficits and concluded that Arenson could perform all his relevant occupational functions. Indeed, Crawford noted the "reassuringly normal" results of Ong's cognitive test to support her opinion that any relevant cognitive difficulties were not due, in whole or in part, to the strokes. LTD 967-98. To be sure, Crawford's opinion does not foreclose the ***possibility*** that the combination of two strokes caused Arenson to experience cognitive difficulties, as Rothke proposed. But that "debatable point[]" neither renders Crawford's opinion irrational nor casts doubt upon her qualifications. *See Semien*, 436 F.3d at 812 (quoting *Sisto v. Ameritech Sickness and Accident Disability Benefit Plan*, 429 F.3d 698, 701 (7th Cir. 2005)).

Arenson also criticizes Brown's report. Arenson argues that Brown improperly speculated when he noted that "previously highly successful individuals" such as Arenson can use coping mechanisms "that outweigh any relative inefficiencies that have developed with

aging." LTD 972. Brown's point did not resemble, as Arenson suggests, the sweeping generalization that the Seventh Circuit rejected in *Hawkins*, *i.e.* if a majority of persons with a claimant's impairment can work, the claimant can too. 326 F.3d at 919. Brown's statement followed his conclusion that Arenson's mild cognitive deficits did not correlate with the neurological assessment, meaning Crawford's conclusion about the expected results of a stroke. Read in context, Brown's comment about aging explained that natural cognitive deterioration with age, rather than the strokes, more likely caused any of the test abnormalities. Brown further opined that persons with cognitive skills similar to Arenson's are able to cope with those natural processes. Thus, Brown commented on the cause of Arenson's particular test results and on his particular cognitive abilities in the context of the medical facts of Arenson's case. As Unum explained in its appeal denial in response to this criticism, Unum's claim determination was "specific to Mr. Arenson" and "based on [his] specific symptoms.'" LTD 1102. That explanation finds "rational support" in the record; namely, Arenson's neuropsychological tests and Crawford's neurological assessment. *Frye*, 657 F.3d at 495.

In sum, nothing in the administrative record supports Arenson's claims that Crawford and Brown were not qualified to evaluate his claims of cognitive deficits. Arenson's disagreements with Crawford and Brown's conclusions do not negate their credentials or their rationales. Unum could therefore reasonably rely on Crawford and Brown's medical judgments to deny Arenson's claim.

### C.    Unum's Reliance on Neuropsychologist Report

Even assuming that Crawford and Brown were not qualified to interpret Rothke's test results, Unum granted Arenson's request to hire a neuropsychologist, Dr. Nowell, to do just that. "[T]he mere fact that [Unum] sought an independent review at all tends to suggest that [its] decision was not arbitrary and capricious." *Lane v. Structural Iron Workers Loc. No. 1 Pension*

*Tr. Fund*, No. 20 C 6769, 2021 WL 6197074, at *8 (N.D. Ill. Dec. 30, 2021). Arenson makes much of the fact that Nowell apparently did not obtain the raw data from his neuropsychological evaluation despite Brown's recommendation to do so.[2] Nowell's decision not to request the data, however, does not render Unum's decision to deny Arenson's benefits arbitrary. Unlike in cases where an insurer inexplicably ignores its own doctors' recommendation to independently examine a claimant, *see Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 775 (7th Cir. 2010); *accord Hennen v. Metro. Life Ins. Co.*, 904 F.3d 532, 541 (7th Cir. 2018), Unum provides a reasonable explanation for Nowell's decision not to request the data that is consistent with its ultimate determination, *see Gallo v. Amoco Corp.*, 102 F.3d 918, 923 (7th Cir. 1996). Nowell's role, according to Unum, was to explain the cognitive functions that Rothke's neuropsychological testing revealed. Nowell perceived no issues with the results of the testing and thus did not need the raw data to contest its validity. Although Nowell's analysis was not lengthy, Unum's defense of Nowell's report is rational. That is all arbitrary and capricious review requires. *Gallo*, 102 F.3d at 923.

Arenson further argues that Nowell's report was deficient because it did not address Arenson's mild deficits or his work-related restrictions. It was within Unum's discretion, however, to leave those tasks to its in-house physicians; "such questions of judgment and management are to be left to the administrator." *Davis*, 444 F.3d at 576. After all, Arenson's concern about Crawford and Brown's qualifications was their ability to interpret

---

[2] Unum does not dispute this characterization, but from its own review of the record, the Court is not so sure that Nowell failed to obtain the raw data underpinning Rothke's test results. Nowell's report refers to Arenson's performance during various trials and evaluates test scores that appear to be absent from Rothke's report. Nowell's report also references "personality inventory and self-report checklists" that are not mentioned in Rothke's summary. LTD 1053. In any event, as the Court explains, Nowell was not required to rely on raw data for Unum's physicians to reasonably rely on his analysis.

neuropsychological test results, not their ability to evaluate his functional capacity when presented with properly interpreted test results. Arenson's unhappiness with the scope of Nowell's review does not mean that Nowell's review was deficient or that Unum's reliance on it was arbitrary. Because it was reasonable for Unum to rely on Nowell's assessment of Rothke's file and delegate evaluation of Nowell's assessment to Crawford and Brown, *see id.* at 549, Arenson's criticisms are unfounded.

### D. Physicians' Weighing of the Evidence

Arenson next argues that Unum's reviewing doctors placed too much weight on normal findings while ignoring or minimizing abnormal results. The Court does not see any evidence of such unsupported cherry-picking. *See, e.g.*, *Leger v. Trib. Co. Long Term Disability Benefit Plan*, 557 F.3d 823, 833-35 (7th Cir. 2009). Every physician to examine Arenson or review his medical records—including Ong and Rothke—concluded that his neurocognitive capacity was either mostly or totally normal. Unum was entitled to consider the overwhelming weight of those medical opinions in determining that Arenson was able to return to work. *See Jenkins v. Price Waterhouse Long Term Disability Plan*, 564 F.3d 856, 861 (7th Cir. 2009) (upholding plan administrator's decision when multiple health professionals found that claimant was not disabled and opinions found support in medical evidence).

Nor did Unum's reviewing doctors ignore abnormal results. "[A] plan administrator must address [evidence supporting a disability determination] and provide a reasonable explanation for discounting it." *Holmstrom*, 615 F.3d at 758. Crawford and Brown acknowledged Arenson's mild impairments but disagreed with Rothke's conclusions about them. As just discussed, Crawford concluded that Rothke's test results were not "functionally relevant" because the cognitive impairments could not have been caused by the strokes. LTD 1059. In other words, Arenson may well have experienced some cognitive impairments, but they did not materially

affect his ability to work. Brown also acknowledged, yet rejected, Rothke's test results, noting that the parts of Arenson's brain that the strokes impaired are generally not associated with Arenson's expressed cognitive difficulties. Like Crawford, Brown rationally explained why he dismissed Rothke's abnormal findings, and Unum was entitled to rely on those rational explanations. *See Geiger*, 845 F.3d at 364 (upholding administrator's determination when physician "acknowledged, rather than ignored" claimant's reports of pain). The physicians' "explanations of their findings here show that they adequately considered" Arenson's test results. *Black*, 582 F.3d at 746. This Court cannot find, therefore, that Unum's reliance on the in-house physician opinions was arbitrary or capricious.

### E. Vocational Assessment

Finally, Arenson argues that Unum inadequately evaluated the demands of his former occupation when assessing whether he could return to work. According to Arenson, his job as a futures trader required skills that would be impossible to apply with even a mild cognitive deficiency, and Unum should have acknowledged those skills in its vocational analysis. On appeal, Unum's vocational specialist, Marsiano, summarized the demands of Arenson's former occupation in a list of six "work temperaments," which Unum then provided to Crawford and Brown. LTD 953, 966, 969. Arenson protests that those "temperaments" did not fully encapsulate a prior vocational specialist's determination, during Unum's initial review, that Arenson's work involved "solving problems . . . based on multiple criteria and data." LTD 326. But this qualm does not render Unum's decision irrational.

For one thing, Crawford's own notes reflect that she reviewed the "medical record" on appeal, which included the "vocational document" that Marsiano prepared. LTD 965. In that report, as Arenson acknowledged in a letter to Unum, Marsiano concluded that Arenson's work involved more complex duties than Unum's prior vocational expert found. Despite reviewing

Marsiano's report, Crawford still found that Arenson could perform his occupational duties. And regardless, the "temperaments" that Crawford and Brown considered included "making judgments and decisions" as well as "sustained focus and concentration." LTD 953. Those skills do not differ so much from problem solving as to make Unum's reliance on the new vocational expert's report "downright unreasonable." *Mote v. Aetna Life Ins. Co.*, 502 F.3d 601, 606 (7th Cir. 2007) (quoting *Herman v. Cent. States, Se. & Sw. Areas Pension Fund*, 423 F.3d 684, 692 (7th Cir. 2005)). As Unum explained in its appeal denial letter, Unum's reviews "fully considered the . . . demands associated with [Arenson's] occupation in the national economy," which "were outlined within the referrals to the reviewing physicians." LTD 1101. Unum's expert physicians' reliance on the vocational expert's determination "makes it possible for Unum to offer a reasoned explanation for its decision to deny benefits, and, under the arbitrary-and-capricious standard, [this Court] must respect Unum's judgment." *Davis*, 444 F.3d at 576 (cleaned up).

*     *     *

The Court emphasizes that the issue in this case is not "whether [the Court] would have terminated [Arenson]'s benefits, but whether Unum's decision to do so finds rational support in the record." *Jenkins*, 564 F.3d at 861 (quotation omitted). At least five medical professionals, including one of Arenson's treating physicians, determined that he did not suffer from any cognitive impairment. Those determinations found support in medical evidence that included neuropsychological testing and evaluation. "That's not to say the evidence compelled [Unum]'s decision, just that it permitted it." *Id.* The Court takes no position on whether Arenson was able to meet the demands of his former occupation. Finding ample support in the record to justify

18

Unum's determination that he was, however, the Court cannot brand it as arbitrary and capricious.

## IV. Life Insurance Plan

That leaves Arenson's contention that he is entitled to a waiver of premium payments under Unum's Life Insurance Plan. Unum's Life Insurance Plan defines disability more narrowly than the Long Term Disability Plan; under the former, a person is disabled if "unable to perform the duties of any gainful occupation for which [the individual is] reasonably fitted by training, education, or experience." LWOP POL 38. Unlike the Long Term Disability Plan, the Life Insurance Plan does not afford Unum discretion in making benefit determinations. In such a scenario, courts review de novo a plan administrator's denial of benefits. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). As the Seventh Circuit has explained, "de novo review" is a bit of a misnomer. *Dorris v. Unum Life Ins. Co. of Am.*, 949 F.3d 297, 303-04 (7th Cir. 2020). This Court determines independently whether the claimant is entitled to benefits under the plan definition instead of "reviewing" the plan administrator's decision. *Diaz v. Prudential Ins. Co. of Am.*, 499 F.3d 640, 643 (7th Cir. 2007). For that reason, "what happened before the plan administrator is irrelevant in a de novo review case." *Dorris*, 949 F.3d at 304. Because Unum has moved for summary judgment, the Court must determine whether Arenson has raised a genuine dispute of material fact regarding his entitlement to benefits under the plan definition. *See id.* Unum argues that Arenson has failed to do so because 1) Arenson did not pay premiums during the nine-month plan elimination period, as required by the Life Insurance Plan, and 2) Arenson is unable to perform the duties of any gainful occupation as defined by the plan.

Arenson protests that Unum raises its first argument too late. That Arenson allegedly did not pay his premiums during the nine-month elimination period, Arneson argues, is an affirmative defense that Unum cannot wait until summary judgment to raise. As Unum points

out, however, Arenson bears the burden to show that he is entitled to a premium waiver under the Life Insurance Plan. *See Cheney v. Standard Ins. Co.*, 831 F.3d 445, 451 (7th Cir. 2016). Because Arenson shoulders that burden, whether he paid premiums cannot be an affirmative defense that Unum had to raise in its answer. *See Winforge, Inc. v. Coachmen Indus., Inc.*, 691 F.3d 856, 872 (7th Cir. 2012) (rejecting plaintiff's argument that defendant waived defense by failing to raise it in its answer when plaintiff bore burden of proving the issue). The Life Insurance Plan states that premium payments "are *required* for an insured while he or she is disabled under [the] plan" during the nine-month elimination period. LWOP POL 18. By failing to provide any evidence that he met that requirement, Arenson has not met his burden of demonstrating that he is covered under the Life Insurance Plan.

In any event, the Life Insurance Plan language also required Arenson to show that "he [was] unable to perform the duties of any gainful occupation" to be eligible for Life Insurance premium waivers under the plan. LWOP POL 38. Arenson included this policy language in his complaint, so he cannot protest that this requirement, like Unum's premium waiver argument, caught him by surprise. Nevertheless, Arenson has submitted no evidence to show that he was unable to be gainfully employed and therefore cannot survive summary judgment on this claim.

Arenson does not dispute that he has presented no evidence to support his claim, but instead argues that the record is not adequately developed for the Court to enter judgment. But as the Seventh Circuit has explained, whether or not the administrative record was fully developed is irrelevant because the Court "is not tasked with reviewing anything in the first place. The question it ha[s] to answer [is] whether [Arenson] [is] entitled to benefits." *Dorris*, 949 F.3d at 395. Because Arenson bears the burden of proving such an entitlement, it is up to him to develop the record. Recognizing this, Arenson argues that he could not do so because Unum misled him

into waiving discovery. According to Arenson, Unum "did not correct" Arenson's "mistaken belief" that the applicable standard of review under the Life Policy was arbitrary and capricious. Pl.'s Reply at 13, ECF No. 33.

The Court is not persuaded. The Life Insurance Policy was equally available to Arenson and to Unum throughout this litigation, and Arenson could have easily determined that the policy did not afford Unum discretion. As the claimant, Arenson is responsible for proving he is entitled to benefits. Part of that responsibility entails ensuring that he is proceeding under the correct standard of review. Having failed to present any evidence that he meets the requirements for premium waivers under the Life Policy, Arenson cannot survive a motion for summary judgment.

\* \* \*

The deferential standard of review afforded to Unum resolves Arenson's Long Term Disability claim. As for Arenson's Life Insurance waiver of premium claim, Arenson falls short of proving that he is covered under the relevant policy. Arenson's motion for partial summary judgment is therefore denied, and Unum's motion for summary judgment is granted.

Dated: January 13, 2023

John J. Tharp, Jr.
United States District Judge

21